**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
——————————————————————

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

          **v.**                     **07-CR-134S(Sr)**

**CHAD WHITE,**

          **Defendant.**
——————————————————————

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. William M. Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

The defendant, Chad White ("the defendant"), is charged with having violated 18 U.S.C. § 2252A(a)(5)(B) in a one count indictment. (Docket #13). He has filed two motions, one seeking "suppression of statements" and the other seeking "suppression of physical evidence." (Docket #22). An evidentiary hearing on those motions was held by this Court on December 13, 2007 and a transcript of that proceeding was filed on February 6, 2008. (Docket #29). The parties were directed to file post-hearing memoranda of law no later than February 27, 2008. The government filed its memorandum on February 27, 2008 (Docket #32) but the defendant chose not to file one. Thereafter, the matter was taken under advisement.

## DISCUSSION AND ANALYSIS

### FACTS[1]

On January 12, 2007, Special Agent Fuselier of the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") applied to Magistrate Judge Scott for a search warrant seeking authorization to search the residence of the defendant located at 4280 Circle Court, Clarence, New York and the seizure of "child pornography, computer equipment and other items which are evidence, fruits and instrumentalities concerning violations of Title 18, United States Code, Sections 2252 and 2252A" and submitted his affidavit sworn to January 12, 2007 in support of said application. Judge Scott issued a search warrant for defendant's residence in response to this application on January 12, 2007. (T. 4)[2].

On January 19, 2007, Special Agents Fuselier, Korzak and Stanford of ICE, along with approximately five other agents, arrived at the defendant's residence at 4280 Circle Court, Clarence, New York at approximately 6:45 a.m. for the purpose of executing the search warrant for that location. (T. 5, 22, 49, 56). The agents did not

---

[1] The facts stated herein are taken from the transcript of testimony given at the evidentiary hearing held on December 13, 2007 (Docket #29) and from the affidavit of Special Agent Fuselier sworn to January 12, 2007 in support of an application for a search warrant authorizing a search of the defendant's residence which application was granted by Magistrate Judge Scott on January 12, 2007.

[2] References are to the transcript of the evidentiary hearing followed by the appropriate page number(s).

have either a Criminal Complaint or a warrant of arrest for the defendant, nor had one been requested on that date. (T. 5, 24, 49, 57). The plan for that day was merely to search the premises and not to arrest the defendant. (T. 6, 49, 57, 73-74).

After announcing their identity and purpose, the agents were allowed entry into the premises by the defendant. The defendant was given a copy of the search warrant and allowed to read it while a number of the agents conducted a "safety sweep" of the premises. (T. 57-58). Upon completion of reading the search warrant, the defendant was asked by Special Agent Fuselier if he understood it and the defendant responded that he did. (T. 7, 25-26). The defendant had answered the door while clad only in a towel and, therefore, he was allowed to proceed upstairs to his bedroom in the company of Special Agents Fuselier and Korzak in order to get dressed. While getting dressed in his bedroom, Agents Fuselier and Korzak engaged in "general" conversation with him. (T. 8-9). At this time, Special Agent Korzak advised the defendant "that this was a search warrant only; there was no warrant for his arrest; [they] were not in possession of a warrant for his arrest and [they] were not placing him under arrest. If he had somewhere to go or didn't want to stay at the residence, he was free to leave." (T. 60-61, 72, 74-75). Special Agent Fuselier advised the defendant that "if he had to go to work, he could." (T. 10-11, 35, 46). When the defendant indicated that "he was going to contact his employer," Special Agent Korzak told him that "if he was going to call in sick to work (sic) or take the day off, he didn't have to do that because of the search warrant. If he wanted to go to work, [they] weren't going to stop him, he was free to go to work. If he wanted to stay at his house, [they] would afford

him that courtesy because it's his residence that [they] were searching, but by no means is he required to stay there and not go to work."  (T. 62-63).  The defendant advised that he chose to stay and he placed a call to his workplace advising that he would not be reporting to work that day.  (T. 11, 63).

Other than asking the defendant "if anyone else was in the house just (sic) for safety purposes, the defendant was not questioned by the agents prior to telling him that he was free to leave.  (T. 60-61, 42).  After the defendant finished dressing, he and Special Agents Fuselier and Korzak proceeded to another room down the hall from the defendant's bedroom.  (T. 62).  The defendant was asked if he would speak to them concerning the investigation, and the defendant responded that he would.  The agents did not give *Miranda* warnings or an advice of rights to the defendant because this was not a "custodial situation."  (T. 11-12).

Both Special Agent Fuselier and Special Agent Korzak posed questions to the defendant which he answered.  At no time did the defendant request an attorney or that the questioning be discontinued.  (T. 12-13, 15, 20, 69).

The defendant was asked if anyone else lived in the house; how long the defendant lived in the house; "questions relative to computer use" of the computers in the house; what e-mail addresses he used; whether "he had any file sharing capabilities;" what "search terms" he used; and whether he had "any child pornography on his computer."  (T. 29, 30-31, 37-38, 38-39, 40).  In his testimony, Special Agent

-4-

Fuselier admitted that such questions and the answers given by the defendant "could be very pertinent to the investigation" being conducted by the agents.  (T. 30-31).

In response to those questions, the defendant stated that his brother had lived with him but had moved out in September 2006 and that he now lived alone.  The defendant admitted that he had a working computer as well as another one "which was not operational at that time" and that his brother had his own computer while he lived there.  The defendant "did not give his password or log ins to his brother to use for his computers."  (T. 64).  He further admitted that "he was the only one that used" his computer.  (T. 37-38).

The defendant also made statements regarding who his internet provider was; his numerous e-mail addresses; and the use of file sharing programs.  However, he denied having child pornography on his computer or trading images of child pornography on his computer; but he did admit "that he had seen child pornography on his computer" involving children he believed to be around 10 years old but that he had deleted them.  (T. 65-66).  He stated that these "images made him uncomfortable" and that they were of "young girls, some girls around the age of 10."  (T. 40).

In response to the agents' questions about "what search terms he used to find pornographic images on the internet, the defendant gave them "several examples" which "were known to kind of relate to underage children in order to find adult pornography that would sometimes be attached to those terms."  He further stated that

he expected or hoped "to find images of females 17, 18 or 19 years old."  (T. 67).

Special Agent Fuselier asked the defendant if "he would make a written statement" and the defendant agreed to do so and did so as reflected in government Exhibit 1.  (T. 16, 68-69, 76-77).  Special Agent Fuselier explained to the defendant that his consent to making a written statement was "voluntary."  (T. 51-53).  Special Agent Fuselier did not tell the defendant what to write in his statement.  The defendant composed it on his own, in his own handwriting, and signed it in the presence of Special Agents Fuselier and Korzak who then signed it as "witnesses."  (T. 17-18, 31-33).  However, this written statement by the defendant did not contain everything that was said orally by the defendant to Special Agents Fuselier and Korzak.  (T. 18).

The computers that were found in the defendant's residence on January 19, 2007 were seized pursuant to the search warrant.  (T. 25).

On February 15, 2007, a criminal complaint charging the defendant with violating 18 U.S.C. § 2252(a)(4)(B)(i) and (ii) and an arrest warrant for the arrest of the defendant were issued, and the defendant was placed under arrest on that date.  (Docket #s 1 and 2).  Thereafter, an indictment was returned charging the defendant with having violated 18 U.S.C. § 2252A(a)(5)(B).  (Docket #13).

### A.     The Defendant's Motion To Suppress Physical Evidence:

The defendant argues that the "search warrant affidavit fails to sufficiently allege that the target computer would contain images of child pornography" and that the "descriptions of the three images [listed in the search warrant affidavit] fail to meet the definition of child pornography set forth in 18 U.S.C. § 2256."  He further asserts that "none of the images set forth in the search warrant rise to the level of the definition of child pornography contained under [18 U.S.C.] § 2256" and therefore, the "search warrant is facially insufficient and is deficient to the point at which no reasonable law enforcement officer could reply upon it."  As a result, the defendant requests that "any evidence that was derived from the execution of the search warrant of the defendant's home" be suppressed.  (Docket #22, pp. 13-14).

In determining whether probable cause exists for the issuance of a search warrant, the United States Supreme Court has stated:

> The totality of the circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific "tests" be satisfied by every informant's tip.  Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a "practical, nontechnical conception."  (citation omitted).  "In dealing with probable cause, . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  (citation omitted.)
>
> In *Aguilar,* we required only that "the magistrate must be informed of *some of the underlying circumstances* from

which the informant concluded that . . . narcotics were where he claimed they were, and *some of the underlying circumstances* from which the officer concluded that the informant . . . was "credible" or his information "reliable." (citation omitted).

As our language indicates, we intended neither a rigid compartmentalization of the inquiries into an informant's "veracity," "reliability," and "basis of knowledge," nor that these inquiries be elaborate exegeses of an informant's tip. Rather, we required only that *some* facts bearing on two particular issues be provided to the magistrate.

\*    \*    \*

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis . . . for [conclud[ing] "that probable cause existed.  (citation omitted).  We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli*.

*Illinois v. Gates*, 462 U.S. 213, 231, 238-239 (1983).

As the Court of Appeals for the Second Circuit stated:

A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden.  "Where [the] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. . . . [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  *United States v.*

-8-

> *Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d
> 684 (1965).  In particular, where the officer requesting the
> search warrant relies on an informant, the magistrate's role is
> to examine the totality of the circumstances and to
> make a practical, commonsense decision whether, given all
> the circumstances set forth in the affidavit before him, including
> the "veracity" and "basis of knowledge" of persons supplying
> hearsay information, there is a fair probability that contraband
> or evidence of a crime will be found in a particular place.  And
> the duty of a reviewing court is simply to ensure that the
> magistrate had a "substantial basis for . . . conclud[ing]" that
> probable cause existed.  *Illinois v. Gates*, 462 U.S. 213,
> 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting
> *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736,
> 4 L.Ed.2d 697 (1960)); *see United States v. Feliz-Cordero*, 859
> F.2d 250, 252-53 (2d Cir. 1988).

*Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).

Special Agent Fuselier submitted an affidavit consisting of thirty-two (32) typewritten pages sworn to January 12, 2007 wherein he describes in detail a child pornography investigation that was commenced in April of 2005 by ICE agents in Seattle, Washington and extended into Ohio which led to the identification of Michael Janosko.  A search warrant for Janosko's residence was obtained in February 2006 and a forensic analysis of his computer revealed "over 1000 image files and approximately 200 movie files containing child pornography" as well as "numerous files related to [a Google] Hello program including chat log and filmstrip files."  (Search Warrant Affidavit of Special Agent Fuselier sworn to January 12, 2007 ("Fuselier Affidavit"), pp. 21-23, ¶s 42-46).  The "Hello" program "is an Internet service that enables users to trade images easily, quickly and securely" and "lets traders connect directly (peer-to-peer) to each other's computers specifically for the purpose of sharing pictures."  (Fuselier Affidavit, p. 18, ¶ 36).  When interviewed by ICE agents, Janosko admitted "that he had traded

images with people." (Fuselier Affidavit, p. 23, ¶ 45). In conducting the forensic review of Janosko's computer, agents also retrieved "numerous communications pertaining to the sexual exploitation of children and the distribution and receipt of digital images of child pornography." The review also established the "user identification number, handle (nickname) and e-mail address for some of the Hello users" including that of the defendant who "was listed as yourmanchad with an e-mail address of **callchad@yahoo.com."** (Fuselier Affidavit, pp. 24-25, ¶s 49-51). The file folder on Janosko's computer relating to the defendant "contained two conversations [which] included discussions relating to the receipt and distribution of child pornography images, thumbnail images of child pornography, and application messages identifying the total number of images exchanged and the number of images sent by each participant." (Fuselier Affidavit, p. 26, ¶ 52). Analysis of this "chat log showed that yourmanchad had sent two hundred sixty four of the images to Janosko and had received two hundred fifty-four images from Janosko." (Fuselier Affidavit, p. 26, ¶ 53). "Three of the images sent by yourmanchad to Janosko" depicted the following:

> (1)   "A naked prepubescent female standing up facing the camera;
>
> (2)   "A naked   prepubescent female sitting in the grass exposing her genital region;" and
>
> (3)   "A naked prepubescent female lying on a blanket exposing her genital region."

(Fuselier Affidavit, pp. 27-28, ¶ 54).

In viewing and considering the totality of the circumstances described in the Fuselier affidavit in a "common sense" fashion, it was reasonable for Judge Scott to find that there was a "fair probability" that child pornography, and/or evidence relating to that criminal activity, would be found at the residence of the defendant.  It is this Court's opinion and finding that Judge Scott had a "substantial basis for concluding that probable cause existed for the issuance of the search warrant at issue herein.  *Illinois v. Gates*, *supra; Ornelas v. United States*, 517 U.S. 690, 696 (1996); *see United States v. Ventresca*, 380 U.S. 102, 109 (1965).

Whether the "three images" described in the Fuselier Affidavit meet the definition of child pornography under 18 U.S.C. § 2256 is ultimately a question of fact to be resolved at a trial.  However, for purposes of determining whether such descriptions provided sufficient probable cause for the issuance of the search warrant for defendant's residence, all that is required is that "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates, supra* at 238-239.  Considering the totality of the circumstances set forth in the Fuselier Affidavit, there was a "substantial basis" to support Judge Scott's finding that probable cause existed that evidence of child pornography would be found on the computers located in the defendant's residence thereby justifying the issuance of the search warrant for that residence.

The defendant's claim that the "descriptions of the three images fail[ed] to meet the definition of child pornography set forth in 18 U.S.C. § 2256" is without legal

-11-

merit.

For purposes of discussing the issue raised by the defendant, the
appropriate definitional terms under 18 U.S.C. § 2256 are as follows:

"Minor" means any person under the age of eighteen years;

\*        \*        \*

"visual depiction" includes undeveloped film and videotape,
and data stored on computer disk or by electronic means
which is capable of conversion into a visual image;

\*        \*        \*

"child pornography" means any visual depiction, including
any photograph, film, video, picture, or computer or
computer-generated image or picture, whether made or
produced by electronic, mechanical, or other means, of
sexually explicit conduct, where -

(A) the production of such visual depiction involves the
use of a minor engaging in sexually explicit conduct;

\*        \*        \*

"graphic," when used with respect to a depiction of sexually
explicit conduct, means that a viewer can observe any part
of the genitals or pubic area of any depicted person or
animal during any part of the time that the sexually explicit
conduct is being depicted.

The stated descriptions of the three child images described in the Fuselier
Affidavit clearly fall within the aforesaid definitions under 18 U.S.C. § 2256 so as to
establish probable cause that "child pornography" or evidence of "child pornography"
would be found at the defendant's residence.  Each image in the Fuselier Affidavit is

described as "a naked prepubescent female" who is either "standing up facing the

camera" or "sitting ... exposing her genital region" or "lying on a blanket exposing her

genital region."  (Fuselier Affidavit, pp. 27-28, ¶ 54).  Each of these three descriptions

fall within the definition of "graphic" as used "with respect to a depiction of sexually

explicit conduct" in that in the "sitting" and "lying" images the "genital regions" of the

"prepubescent females" are "exposed" and therefore subject to being "observed" by a

"viewer."  The same conclusion applies to the image described as a "naked

prepubescent female standing up facing the camera" since it reasonably follows that

such a pose would enable a "viewer" to "observe any part of [her] genitals or pubic

area."  All three poses could also perhaps be considered as "lascivious exhibitions."

*See United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd,* 812 F.2d 1239 (9th

Cir. 1987), *cert. denied,* 484 U.S. 856 (1987).


        Even if it were assumed, *arguendo*, that probable cause was lacking for

the issuance of the search warrant authorizing the search of the defendant's home,

suppression of the evidence seized as a result of the execution of the warrant is not

mandated.

> [T]he exclusionary rule is designed to deter police
> misconduct rather than to punish the errors of judges and
> magistrates.  Second, there exists no evidence suggesting
> that judges and magistrates are inclined to ignore or subvert
> the Fourth Amendment or the lawlessness among these
> actors requires application of the extreme sanction of
> exclusion.

                    *        *        *

> [S]uppression of evidence obtained pursuant to a warrant
> should be ordered only on a case-by-case basis and only in
> those unusual cases in which exclusion will further the
> purposes of the exclusionary rule.
>
> *     *     *
>
> It is the magistrate's responsibility to determine whether the
> officer's allegations establish probable cause and, if so, to
> issue a warrant comporting in form with the requirements of
> the Fourth Amendment.  In the ordinary case, an officer
> cannot be expected to question the magistrate's probable-
> cause determination or his judgment that the form of the
> warrant is technically sufficient.  "[O]nce the warrant issues,
> there is literally nothing more the policeman can do in
> seeking to comply with the law."  (citation omitted).
> Penalizing the officer for the magistrate's error, rather than
> his own, cannot logically contribute to the deterrence of
> Fourth Amendment violations.

*United States v. Leon*, 468 U.S. 897, 916, 918, 921 (1984).

Nothing has been presented by the defendant to indicate, let alone

establish, bad faith on the part of Special Agent Fuselier in his affidavit and application

for the search warrant of defendant's residence.  Therefore, the "good faith" doctrine

under *Leon* is applicable since the defendant has failed to establish that the exclusion

of the evidence seized from his residence on January 19, 2007 would "further the

purposes of the exclusionary rule."  Therefore, based on the foregoing, it is

RECOMMENDED that defendant's motion to suppress the physical evidence seized

from his residence on January 19, 2007 be DENIED.

###### B.    The Defendant's Motion To Suppress Statements:

The defendant erroneously argues that "any statements made by [him]

prior to the administration of <u>Miranda</u> warnings is (sic) presumptively involuntary and

should be suppressed."  (Docket #22, p. 12, ¶ 25).


Admittedly, the defendant was never given any warnings pursuant to

*Miranda v. Arizona*, 384 U.S. 436 (1966) by the agents when they interviewed him at his

home on January 19, 2007 during the search of his residence pursuant to the search

warrant.  (T. 11-12).

> In *Miranda v. Arizona, supra*, the court held that the Fifth
> Amendment privilege against self-incrimination prohibits
> admitting statements given by a suspect during "**custodial
> interrogation**" without a prior warning.  Custodial
> interrogation means "questioning initiated by law
> enforcement officers after a person has been taken into
> custody. . . ."
>
> *          *          *
>
> It is the premise of *Miranda* that the danger of coercion
> results from the interaction of custody and official
> interrogation.  We reject the argument that *Miranda*
> warnings are required whenever a suspect is in custody in a
> technical sense and converses with someone who happens
> to be a government agent."

*Illinois v. Perkins*, 496 U.S. 292, 296-297 (1990) (citations omitted) (emphasis added).

Before the requirements of *Miranda* come into play, there must be a form

of "custody" of the person to be interrogated which "custody" amounts to the deprivation

of "freedom of action in any significant way."  *Miranda v.* Arizona, 384 U.S. 436, 444

(1966); *Thompson v. Keohane*, 516 U.S. 99, 100-101 (1995); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004). The defendant bears the burden of proving custody. *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984). In making a determination of whether such "custody" existed, the Court must consider the totality of the circumstances. *California v. Beheler*, 463 U.S. 1131, 1125 (1983)*; Tankleff v. Senkowski, supra*. "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (Citation omitted). *California v. Beheler* at 1125; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The United States Supreme Court has "explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect'." *California v. Beheler* at 1125; *Mathiason* at 495.

"[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *United States v. Newton, supra* at 675; *United States v Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992).

The Court of Appeals for the Second Circuit has ruled that:

The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with

-16-

a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.  An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.  *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir.) (internal quotation marks and citation omitted, *cert. denied*, 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *see also United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (a custodial setting is evidenced by "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak").

*Tankleff v. Senkowski* at 243-244.

As the Court of Appeals for the Second Circuit has stated, the Supreme Court's decision in *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984) "emphasizes that 'the only relevant inquiry [in determining when a person is in "custody" for purposes of Miranda] is how a reasonable man in the suspect's position would have understood his situation'."  *Cruz v. Miller*, 255 F.3d 77, 83 (2d Cir. 2001).

I find the testimony of Special Agents Fuselier, Korzak and Stanford to be totally credible in this matter.  Further, the defendant has failed to produce anything that would in any way contradict or impair the testimony of Special Agents Fuselier and Korzak relating to their advice to the defendant that he was free to leave since they were merely executing a search warrant and that he was not under arrest.  (T. 6, 49, 57, 73-74, 60-61, 72, 74-75, 10-11, 35, 46, 62-63).  The defendant voluntarily agreed to provide a written statement (Government Exhibit 1) to the agents.  (T. 16, 51-53, 68-69, 76-77).

Based on the testimony of Special Agents Fuselier and Korzak, I find that the defendant was never subjected to "custodial interrogation" by the agents and that it would not have been reasonable for him to believe that he was under arrest and not free to leave.  As a result, it is RECOMMENDED that the defendant's motion to suppress his statements to the agents on January 19, 2007 be DENIED.  Therefore, it is hereby

ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order</u>.**  *Thomas v. Arn,*

474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir.

1988).


The parties are reminded that, pursuant to Rule 58.2 of the Local Rules

for the Western District of New York, "written objections shall specifically identify the

portions of the proposed findings and recommendations to which objection is made and

the basis for such objection and shall be supported by legal authority." **Failure to**

**comply with the provisions of Rule 58.2, or with the similar provisions of**

**Rule 58.2 (concerning objections to a Magistrate Judge's Report,**

**Recommendation and Order), may result in the District Judge's refusal to**

**consider the objection.**


*S/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

**DATED:**     **Buffalo, New York**
                     **December 12, 2008**